# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GREGORY PAUL SHERMAN,

      Plaintiff,

      vs.                                      No. 1:20-CV-00887-KRS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,[1]

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court upon Plaintiff Gregory Paul Sherman's Motion to Reverse and Remand for a Hearing with Supporting Memorandum (Doc. 21), dated June 7, 2021, challenging the determination of the Commissioner of the Social Security Administration ("SSA") that Sherman is not entitled to disability insurance benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Commissioner responded to Sherman's motion on September 1, 2021 (Doc. 25), and Sherman filed a reply brief on September 21, 2021 (Doc. 26). With the consent of the parties to conduct dispositive proceedings in this matter, *see* 28 U.S.C. § 636(c); FED. R. CIV. P. 73(b), the Court has considered the parties' filings and has thoroughly reviewed the administrative record. Having done so, the Court concludes that the Administrative Law Judge ("ALJ") erred in his decision and will therefore GRANT Sherman's motion and remand this case back to the SSA for proceedings consistent with this opinion.

---

[1] The Acting Commissioner is substituted as the proper Defendant pursuant to FED. R. CIV. P. 25(d).

## I. PROCEDURAL POSTURE

On March 9, 2012, Sherman filed an initial application for disability insurance benefits. (*See* Administrative Record ("AR") at 66). He also protectively filed an application for supplemental security income on March 26, 2012. (*See id.* at 67). Sherman alleged that he had become disabled due to bipolar disorder. (*Id.* at 68-69, 80-81). His application was denied at the initial level (*id.* at 66-67) and at the reconsideration level (*id.* at 92-93). After conducting a hearing, where Sherman amended his alleged onset date to November 21, 2010 (*see id.* at 32-65), ALJ Ann Farris concluded that Sherman was not disabled under the relevant sections of the Social Security Act (*see id.* at 16-26). The Appeals Council denied review. (*See id.* at 614-16).

Sherman sought judicial review of the Commissioner's decision. *See* Complaint, *Sherman v. Berryhill*, No. 1:16-cv-00310 CG [hereinafter *Sherman I*], ECF No. 1 (D.N.M. Apr. 19, 2016). In moving for remand, Sherman argued that ALJ Farris erred by, among other things, failing to give legitimate reasons for rejecting certain medical source statements from treating psychiatrist Kevin Rexroad, Ph.D., and from consultative examiner Paula Hughson, M.D. *See* Motion to Reverse and Remand for a Rehearing, *Sherman I*, ECF No. 17 (D.N.M. Nov. 23, 2016). On March 30, 2017, United States Magistrate Judge Carmen E. Garza granted Sherman's motion on both grounds and remanded the matter to the Commissioner for further proceedings. *See* Memorandum Opinion and Order, *Sherman I*, 2017 WL 3575868 (D.N.M. Mar. 30, 2017).

While his case was pending before Judge Garza, Sherman filed a second application for disability insurance benefits, alleging disability beginning on May 1, 2013 due to bipolar disorder, depression, high cholesterol, high blood pressure, and Asperger's syndrome. (*See* AR at 643-44). Sherman's new Title II claim was denied at the initial level on May 26, 2017. (*See id.* at 642). On June 23, 2017, having received Judge Garza's order, the Appeals Council remanded the

matter to ALJ Farris for further proceedings and directed her to consolidate Sherman's new Title II application with that matter. (*See id.* at 639-40).

After conducting a second hearing (*see id.* at 566-94), ALJ Farris determined that Sherman was not disabled from November 21, 2010 through the date of her decision (*see id.* at 538-58). Sherman eschewed the filing of exceptions with the Appeals Council, *see generally* 20 C.F.R. § 404.984(a), instead choosing to again seek judicial review. *See* Complaint, *Sherman v. Berryhill*, 1:18-cv-00439 KK [hereinafter *Sherman II*], ECF No. 1 (D.N.M. May 10, 2018). In his motion for remand, Sherman again claimed that ALJ Farris erred by, among other things, failing to properly handle medical source statement evidence from Dr. Rexroad and Dr. Hughson. *See* Motion to Reverse and Remand for a Rehearing, *Sherman II*, ECF No. 18 (D.N.M. Sept. 28, 2018). On June 12, 2019, United States Magistrate Judge Kirtan Khalsa concluded that ALJ Farris erred in her treatment of Dr. Rexroad's statements and failed to properly account for the uncontroverted medical opinions of Dr. Rexroad, Dr. Hughson, and another provider when formulating Sherman's RFC. *See* Memorandum Opinion and Order, *Sherman II*, 2019 WL 2450919 (D.N.M. June 12, 2019). Accordingly, Judge Khalsa granted Sherman's motion on this basis and remanded the matter to the Commissioner with a recommendation that a different ALJ be reassigned for further proceedings. *See id.*

Pursuant to a June 28, 2019 order of the Appeals Council, the matter was remanded to ALJ Stephen Gontis for proceedings consistent with Judge Khalsa's order. (AR at 1068). ALJ Gontis conducted a third hearing in this matter on January 29, 2020. (*Id.* at 986-1032). Sherman was represented by counsel and testified at the hearing, as did a vocational expert. (*See id.*).

On June 29, 2020, ALJ Gontis issued his decision finding that Sherman was not disabled under the relevant sections of the Social Security Act from November 1, 2005[2] through the date of that decision. (*See id.* at 952-75). Sherman did not file exceptions with the Appeals Council, instead filing the complaint in this case on August 31, 2020. (*See* Doc. 1).

## II. LEGAL STANDARDS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016); *see also* 42 U.S.C. § 405(g). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Although a court must meticulously review the entire record, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See, e.g.*, *id.* (quotation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is "not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154 (quotation omitted); "if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118; or if it "constitutes mere conclusion," *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the record as a whole, "including anything that

---

[2] ALJ Gontis appears to have missed Plaintiff's early amendment of his alleged onset date from November 1, 2005, to November 21, 2010 (*see, e.g.*, AR at 16, 36, 1217), perhaps in part because Plaintiff's counsel erroneously confirmed the earlier date at the third hearing (*see id.* at 995) (affirming 2005 alleged onset date). Because the period cited by ALJ Gontis encompasses the period of alleged disability, this error is immaterial for present purposes.

may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation omitted).

## B.   Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step,

the burden shifts to the Commissioner to determine whether, considering the claimant's

vocational factors, he is capable of performing other jobs existing in significant numbers in the

national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988)

(discussing the five-step sequential evaluation process in detail).

### III.  THE ALJ'S JUNE 2020 DETERMINATION

ALJ Gontis reviewed Sherman's claim pursuant to the five-step sequential evaluation

process. (AR at 953-54). First, ALJ Gontis found that Sherman had not engaged in substantial

gainful activity since prior to his alleged onset date. (*See id.* at 954-55). ALJ Gontis then found at

step two that Sherman suffered from several nonsevere impairments as well as the following

severe impairments: bipolar disorder, attention deficit disorder, anxiety disorder, social phobia

disorder, and "schizotypal and autism spectrum disorder traits." (*See id.* at 955). As will become

apparent, it is important to note that while ALJ Gontis found Sherman suffered from *traits* of

schizotypal personality disorder and autism spectrum disorder, he rejected a finding that

Sherman suffered from the disorders themselves despite diagnoses to this effect from Dr.

Rexroad and Dr. Hughson. (*See id.* at 955-56). Still, he asserted that the label for Sherman's

impairments was "of no real consequence" and that the "pivotal" issues are "the impact of the

impairment, and in particular, any limitations it may impose upon the claimant's ability to

perform basic work functions." (*See id.* at 955-56).

At step three, ALJ Gontis concluded that Sherman did not have an impairment or

combination of impairments that met the criteria of listed impairments under Appendix 1 of the

SSA's regulations. (*See id.* at 956-58). In so holding, ALJ Gontis found that Sherman possessed

only mild or moderate limitations in the four broad areas of mental functioning, meaning that he

did not satisfy the "paragraph B" criteria of sections 12.04 (bipolar and related disorders), 12.06

(anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 12.10 (autism spectrum disorder) of Appendix 1. (*See id.*). ALJ Gontis also determined from "the totality of evidence" that Sherman did not satisfy the "paragraph C" criteria of listings 12.04 and 12.06, despite acknowledging that "some sources" had opined otherwise. (*See id.* at 958).

Proceeding to the next step, ALJ Gontis reviewed the evidence of record, including statements and other medical evidence from Dr. Rexroad, Dr. Hughson, and other medical sources; statements from third parties; and Sherman's own subjective symptom evidence. (*See id.* at 959-73). In doing so, ALJ Gontis accorded "little weight" to medical source statements provided by Dr. Rexroad throughout the history of the case (*see id.* at 965-67), opinions provided by an earlier treating psychiatrist (*id.* at 968-69), and opinions provided by Sherman's counselors (*see id.* at 967-68). ALJ Gontis also accorded "little weight" to opinions provided by consultative examiner Dr. Hughson in July 2019 (*see id.* at 969-70), while according only "some weight" to other opinions from Dr. Hughson (*see id.* at 969) and from specialists at the Transdisciplinary Evaluation and Support Clinic ("TEASC") at the University of New Mexico School of Medicine, to whom Sherman was referred for Asperger's screening (*see id.* at 965). ALJ Gontis likewise accorded "some weight" to the findings of state agency medical and psychological consultants (*see id.* at 964-65) and to opinion evidence from third parties (*see id.* at 968, 971). Ultimately, ALJ Gontis rejected the medical opinions of all of Sherman's treating providers, and he did not accord more than "some weight" to any other source in the record. (*See id.* at 964-73).

Following his assignment of weight to the various medical source opinions, ALJ Gontis acknowledged that a key issue in the most recent remand order from Judge Khalsa concerned ALJ Farris's failure to incorporate uncontroverted findings from Dr. Rexroad and other providers, whose opinions ALJ Farris had previously accorded "some" weight, into Sherman's

RFC. (*See id.* at 971); *see also, e.g.*, *Sherman II*, 2019 WL 2450919, at *8 (citing AR at 555) (noting weight of Dr. Rexroad's opinions). In a sense, ALJ Gontis's decision to now assign "limited" weight to these same opinions mooted that issue, since this new weighting was functionally equivalent to rejecting those opinions altogether. *See Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (unpublished) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)). Nevertheless, in light of the most recent remand order, ALJ Gontis elaborated on his reasons for deciding not to incorporate the findings of Dr. Rexroad and other treating or examining providers into his RFC, and in doing so he reiterated his reasons for finding that "the objective medical evidence and the claimant's reports . . . greatly undermine the near categorically marked or debilitating restrictions found by treating and examining sources alike." (*See* AR at 971-73) (discussing "inconsistencies" of source opinions with other evidence).

From his review of the record evidence, ALJ Gontis concluded that Sherman possessed an RFC to perform a full range of work with the following nonexertional limitations:

> performing simple, routine tasks; using judgment to make simple work-related decisions; interacting with supervisors occasionally; interacting with coworkers occasionally; no more than infrequent, superficial interaction with the public; and tolerating few changes in a routine work setting. The claimant's time off-task would be accommodated by normal breaks.

(*See id.* at 958-59). Based on this RFC, ALJ Gontis determined that Sherman was unable to perform any past relevant work. (*See id.* at 973).

Moving to step five, ALJ Gontis determined that Sherman was able to perform other jobs existing in significant numbers in the national economy. (*See id.* at 973-74). ALJ Gontis therefore concluded that Sherman's work was not precluded by his RFC and that he was not disabled. (*See id.* at 974-75).

## IV.  DISCUSSION

Although Sherman refuses to concede that the ALJ[3] properly assessed *any* of Dr. Rexroad's medical opinions, he specifically argues that the ALJ erred by rejecting the opinions provided in Dr. Rexroad's January 2018 medical source statement concerning Sherman's ability to perform work-related activities. (*See* Doc. 21 at 10-18 & n.8). Sherman also challenges the ALJ's evaluation of opinions provided by Dr. Hughson in a July 2019 report and a corresponding assessment of ability to perform work-related activities. (*See id.* at 18-27). Because the Court concludes that remand is required as to the ALJ's handling of the opinions expressed in Dr. Rexroad's 2018 statement, Plaintiff's additional claim of error is not reached. *See, e.g.*, *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

In his January 2018 statement, Dr. Rexroad assessed Sherman as having eight marked and six moderate limitations. (*See* AR 940-41). More particularly, Dr. Rexroad found that Sherman possessed moderate or marked limitations in a majority of the abilities listed under each of the four broad areas of mental functioning. (*See id.*); (*see also* AR at 553) (summarizing findings). The ALJ gave multiple reasons for according "little weight" to these opinions (*see id.* at 967), and as noted, he elaborated on his reasoning in additional detail elsewhere in his decision (*see id.* at 971-73). Sherman argues that the ALJ's determination was legally erroneous and, when proper legal standards are applied, does not provide substantial evidence for his decision not to accord controlling weight to Dr. Rexroad's 2018 opinions. (*See* Doc. 21 at 10-18). The Commissioner defends the ALJ's application of legal standards and contends that his reasoning was supported by substantial evidence. (*See* Doc. 24 at 10-14).

---

[3] References to "the ALJ" in this discussion should be understood as referring to ALJ Gontis unless context indicates otherwise.

SSA regulations provide that an ALJ should "[g]enerally . . . give more weight to opinions from [claimant's] treating sources." *See Watkins*, 350 F.3d at 1300 (citing 20 C.F.R. § 404.1527(c)(2)[4]). Usually "[t]he treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'" *See Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quotation omitted).

However, the general rule concerning treating physicians gives way under certain circumstances. If the ALJ finds that the treating physician's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and/or is not "consistent with other substantial evidence in the record," then the ALJ may choose to afford less than controlling weight to the physician's opinion. *See Watkins*, 350 F.3d at 1300 (citing SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)[5]). In such cases, the ALJ must then consider certain factors in determining what weight to assign to the opinion, including

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

---

[4] Plaintiff's claims were filed before March 27, 2017, meaning that the new regulations concerning the handling of medical opinion evidence found at 20 C.F.R. § 404.1520c and 20 C.F.R. § 404.920c do not apply to this proceeding. Although Plaintiff applied for benefits under both Title II and Title XVI, the Court hereinafter cites only to the regulations promulgated under Title II and does not also cite to the parallel regulations under Title XVI.

[5] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

*See id.* (quoting *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)). Given the "deference" to which treating physician medical opinions are entitled, this analysis is "sequential"; the ALJ must first determine whether those opinions are well-supported and consistent with the medical record, and only upon concluding otherwise may the ALJ then consider the other factors in deciding what weight to assign. *See id.* at 1300-01.

Although the ALJ need not expressly discuss all of the aforementioned factors, he must fully consider them and give "good reasons" for his weighting of the treating physician's opinions. *See id.*; *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (citing SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006)) (recognizing that "[n]ot every factor for weighing opinion evidence will apply in every case"). "The record must demonstrate that the ALJ considered all of the evidence," and he must discuss not just the evidence supporting his decision, but also "the uncontroverted evidence he chooses not to rely upon" and "significantly probative evidence he rejects." *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Further, the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted). Nor may an ALJ "mischaracterize or downplay evidence to support her findings." *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (unpublished) (citing *Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987)).[6]

The Court acknowledges that ALJ Gontis provided a substantially more detailed analysis of the record evidence than was provided in previous ALJ decisions in this matter. Moreover, the Court expresses appreciation for the ALJ's thorough discussion as to his reasons for rejecting opinions expressed by Dr. Rexroad and other medical sources, particularly where discussing

---

[6] The Court cites *Bryant*, other unpublished decisions of the Tenth Circuit, and the district court decisions referenced in this opinion for their persuasive value unless otherwise stated.

opinions on issues that are necessarily reserved to the Commissioner. (*See* AR at 971-73)
(explaining reasons for rejecting treating and examining providers' findings that Sherman is
"unable to work" or "disabled," and expressing apparent frustration that providers reached these
conclusions without "address[ing] [the fact] that the claimant's past work involved lots of social
interaction"); *see also* 20 C.F.R. § 404.1527(d)(1) (noting that determinations of disability or
ability to work are reserved to the Commissioner). Nonetheless, the Court finds that the ALJ
failed to articulate with sufficient specificity his conclusion that Dr. Rexroad's 2018 opinions
were unsupported by objective evidence. The Court further finds that the ALJ failed to follow
controlling legal standards in determining that Dr. Rexroad's 2018 opinions were inconsistent
with the record and that this determination was not supported by substantial evidence. For these
reasons, the Court cannot conclude that the decision to accord less than controlling weight to Dr.
Rexroad's 2018 medical source statement was supported by substantial evidence, and this matter
must be remanded for additional consideration by the ALJ.

### A.   Medically Acceptable Clinical and Laboratory Diagnostic Support

A treating physician's opinions may be accorded less than controlling weight if they are
not "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20
C.F.R. § 404.1527(c)(2). In this case, Sherman forcefully rejects the ALJ's conclusion that "Dr.
Rexroad did not provide any supporting objective medical evidence for his opinion in 2018" (AR
at 967), pointing to over eight years of treatment records and rejecting the implication that a
psychiatrist may not rely on his own conclusions drawn from a claimant's subjective statements.
(*See* Doc. 21 at 12-13). Similarly, Sherman contends that the ALJ misrepresented Dr. Rexroad's
mental status examination ("MSE") findings as generally "normal" despite a history of abnormal
findings. (*See id.* at 14-16). The Commissioner largely echoes the ALJ's findings, arguing that

the ALJ properly characterized and relied upon Dr. Rexroad's MSE findings and correctly highlighted an absence of objective supporting evidence. (*See* Doc. 25 at 11-13).

At the outset, it should be clarified that even a complete absence of "objective" supporting evidence does not necessarily mean that a psychiatrist's opinions must be discounted. *See, e.g.*, *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (quoting *Doyal*, 331 F.3d at 762) ("The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."). In unpublished but persuasive caselaw, the Tenth Circuit has acknowledged that "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *See Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005) (unpublished). As such, "[t]he ALJ cannot reject [a psychiatric source's] opinion solely for the reason that it was based on [a claimant's] responses because such rejection impermissibly substitutes [the ALJ's] judgment for that of [the psychiatric source]." *See id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996)) (emphasis added). Trial courts therefore routinely reject an ALJ's substitution of her own "lay speculation and assumptions" where an examining medical provider's contrary opinion was "supported by tests, evaluations, and reports." *See, e.g., Garcia v. Berryhill*, No. CV 16-1034 CG, 2017 WL 3328184, at *4 (D.N.M. Aug. 3, 2017) (finding reversible error where ALJ assigned only "partial weight" to examining provider's opinions concerning severity of limitations and instead concluded from her own observations that claimant "appeared capable in most social situations").

On the other hand, "*Thomas* does not stand for the proposition that an ALJ cannot, in determining *what weight to assign an opinion*, consider that the opinion is based on subjective information provided by the claimant." *Houston v. Colvin*, 180 F. Supp. 3d 877, 888 (D.N.M.

2016) (citing 147 F. App'x at 759-60). "Although the ALJ cannot substitute his judgment for that of a psychiatrist, the Tenth Circuit has not forbidden an ALJ from considering information unavailable to the psychiatrist that discredits the subjective statements on which the psychiatrist relied." *Id.* As long as the ALJ's weighting of a treating source's opinion otherwise finds support in the record as a whole, that weighting should not be disturbed simply because the ALJ also noted that the opinion depended in part on the claimant's subjective statements. *See, e.g., id.* at 888-89 (rejecting challenge to weighting of consultative examiner's opinion where RFC was consistent with other medical and non-medical evidence).

A relevant question, then, is whether Dr. Rexroad's 2018 opinions found support in objective measures such as "tests, evaluations, and reports." *See, e.g., Garcia*, 2017 WL 3328184, at *4. Dr. Rexroad's examination notes reflect MSE findings, and the parties concede that these amount to objective evidence that a psychiatric source may rely upon in formulating opinions. (*See, e.g.*, AR at 909-26, 945-48); (*see also e.g.*, Doc. 25 at 12-13) (citing 20 C.F.R. §§ 404.1502(f)-(g), 404.1527(c)(3)) (discussing consideration of MSE). The ALJ acknowledged that these findings showed that Plaintiff routinely exhibited "mood disturbances, slowed speech, occasionally obsessive thoughts" (AR at 967), "fair-to-poor judgment and insight," and monotone or anxious speech tone (*id.* at 958), all of which—along with regularly constricted affect and sporadic hallucinations or suicidal ideation—are reflected in Dr. Rexroad's notes. (*See, e.g., id.* at 909-23); (*see also* Doc. 26 at 4-5) (summary of abnormal MSE findings). On their face, these findings appear to provide support for many of Dr. Rexroad's opinions, including those concerning Sherman's ability to understand and remember detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to complete a normal workday without interruptions from

psychological-based symptoms, and to work in coordination with or get along with coworkers without distracting them or being distracted by them. (*See id.* at 940-41).

In light of these MSE findings and their facial correlation with Dr. Rexroad's opinions, the ALJ's conclusion that "Dr. Rexroad did not provide *any* supporting objective medical evidence for his opinion" (*see id.* at 967) (emphasis added) is puzzling and lacks sufficient explanation. While the Commissioner contends that the ALJ's conclusion is justified because Dr. Rexroad "did not complete the 'Comments' section" of the 2018 medical source statement (Doc. 25 at 11), the ALJ did not provide this reason for discounting Dr. Rexroad's opinions. *See, e.g., Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) ("[T]his court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself."). In any event, this argument is a nonstarter; the ALJ was required to consider the record as a whole when weighing medical source opinions, and indeed he explicitly cited Sherman's own MSE findings in explaining his weighting of Dr. Rexroad's medical source statement (*see* AR at 967). Because these MSE findings on their face appear to differ from the ALJ's conclusion that supporting objective medical evidence was lacking, the ALJ was required to provide "appropriate explanations" for why this was not the case. *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also Oldham*, 509 F.3d at 1258 (citing SSR 06-03p, 2006 WL 2329939, at *5) (requiring ALJ to give "good reasons" for rejecting treating provider opinions).

Elsewhere in the decision, the ALJ stated that he considered Dr. Rexroad's MSE findings to be "highly inconsistent" with his assessment of "near categorically marked or debilitating restrictions." (*See* AR at 971-72). This conclusion, however, is vague and conclusory; the ALJ did not elaborate on how Dr. Rexroad's consistent observations of abnormal MSE results failed to support his opinions, except to note in a similarly conclusory fashion that the MSE findings

were "otherwise normal." (*See id.* at 967).[7] Again, this will not do. *See Oldham*, 509 F.3d at

1258 (citing SSR 06-03p, 2006 WL 2329939, at *5). "To the extent there may be legitimate

reasons for discounting [Dr. Rexroad's] opinions because they are inconsistent with his MSEs,

the ALJ failed to articulate with sufficient specificity those reasons." *See McGehee v. Saul*, No.

18-cv-01164 KK, 2019 WL 6219507, at *6 (D.N.M. Nov. 21, 2019) (finding error where ALJ

"provided no explanation to support" the "vague and conclusory" determination that treating

psychiatrist's opinions were unsupported by MSEs).

The ALJ also failed to address whether Dr. Rexroad's opinions were supported by

clinical diagnostic testing performed by the TEASC medical sources. In according "some

weight" to the TEASC opinion, the ALJ approvingly noted that the opinion included "various

standardized tests [the providers] administered to assess autism traits" (AR at 965), including a

Social Responsiveness Scale: Second Edition ("SRS-2") administered to Sherman and his

parents as well as a Scales of Independent Behavior-Revised ("SIB-R") completed by Sherman's

father (*see id.* at 932-33). Although the SRS-2 and SIB-R results obtained from Sherman's

parents produced results in the average to mild-limitation range, the SRS-2 administered to

---

[7] To be clear, the Court is not reweighing the import of the alleged "normal findings" against that of the abnormal findings. *See Oldham*, 509 F.3d at 1257 ("[Courts] review only the *sufficiency* of the evidence, not its weight . . . ."). But as Sherman stresses, it is "unclear which 'otherwise normal findings' the ALJ is relying on." (Doc. 21 at 15). Certainly "otherwise normal" is not how Dr. Rexroad himself characterized Sherman's mental status. *Cf. Sherman II*, 2019 WL 2450919, at *10 (noting that ALJ's characterization of Dr. Rexroad's findings as showing "stable" condition did not correspond to an explicit finding to that effect). When describing Dr. Rexroad's MSEs in this fashion, the ALJ typically cited notes from a single session that in fact presented multiple abnormal findings (*see, e.g.*, AR at 962) (citing *id.* at 454) ("Exhibit 9F, 2," showing depressed and anxious mood, constricted affect, and obsessive thought content) or cited to entire exhibits without further elaboration (*see, e.g.*, *id.* at 963) (citing *id.* at 906-26) ("Exhibit 19F," encompassing four and a half years of treatment notes). At most, the decision suggests that the ALJ may have premised his finding of "normal" MSE results on the fact that Dr. Rexroad did not record Sherman engaging in any restless, lethargic, or otherwise odd behavior, even when he recorded other abnormal MSE indicators. (*See id.* at 966) (citing *id.* at 474) (describing Dr. Rexroad's "largely normal contemporaneous exam of the claimant (i.e., normal behavior)" when assessing an earlier opinion from Dr. Rexroad); (*cf., e.g.*, *id.* at 474) (listing no abnormal behaviors, but recording Dr. Rexroad's simultaneous observations of slow speech, depressed and anxious mood, constricted affect, obsessive thoughts, and only "fair" insight or judgment). But if this is so, the ALJ should be clear on this point, and he should explain why a single unremarkable MSE indicator renders Sherman's status "largely normal" (AR at 972) despite multiple abnormal indicators. *See, e.g.*, *Bryant*, 753 F. App'x at 641 (ALJ may not "mischaracterize or downplay evidence to support her findings").

Sherman himself "revealed clinically significant concerns with social communication, social motivation, and restricted and repetitive behaviors," as well as less significant concerns, "for an overall score in the moderate range." (*See id.*). The latter results are facially consistent with Dr. Rexroad's findings of moderate limitations in particular social skills, such as getting along with coworkers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior, and responding appropriately to changes in the workplace. (*See id.* at 941). While "an ALJ is not required to discuss every piece of evidence," some discussion of this potentially "significantly probative" clinical evidence was required before the ALJ concluded that, notwithstanding this evidence, Dr. Rexroad's medical source statement entirely lacked objective evidentiary support. *See Clifton*, 79 F.3d at 1009-10.

Given the clinical and MSE evidence that was at least facially supportive of the opinions expressed in Dr. Rexroad's 2018 medical source statement, the ALJ failed to articulate with sufficient specificity his conclusion that the opinions expressed therein were wholly unsupported by objective evidence. *See, e.g.*, *Oldham*, 509 F.3d at 1258 (citing SSR 06-03p, 2006 WL 2329939, at *5). To the extent that the ALJ's decision not to accord controlling weight to Dr. Rexroad's 2018 opinions was premised on that conclusion, the Court cannot find on this record that the decision was supported by substantial evidence.

### B.  Consistency with the Medical Record

An ALJ may decline to accord controlling weight to a treating physician's opinions that are "inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2). Here, the ALJ determined that the opinions in Dr. Rexroad's 2018 medical source statement were inconsistent with those expressed in his 2013 and 2014 statements (AR at 967) and that his findings were inconsistent with those in the TEASC report, which ruled out a

diagnosis of Asperger's (*id.* at 972). He also concluded that Dr. Rexroad's 2018 opinions were "somewhat internally inconsistent." (*Id.* at 967).

"In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (quotation omitted). "[W]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin*, 365 F.3d at 1215 (quotation omitted). For the reasons that follow, the Court finds that the ALJ's inconsistency findings failed to follow these and other relevant legal standards and were otherwise unsupported by substantial evidence.

### i.   *"Internally Inconsistent" Findings*

The ALJ found "internal[] inconsisten[cy]" between Dr. Rexroad's finding in May 2018 that Sherman was "managing part-time work but [making] no other progress towards independence" on the one hand, and Dr. Rexroad's observation that Sherman continued to work part-time through a temporary employment agency in February 2019 on the other. (AR at 967) (ALJ finding); (*id.* at 1277) (May 2018 notes); (*id.* at 1275) (February 2019 notes stating that "Mr. Sherman present[s] temporarily employed"); (*see also id.* at 993, 1274) (noting that work through temporary agency ended before May 2019 appointment). On the surface, however, it is not clear what is inconsistent between these findings; Sherman was apparently working part-time on both occasions, and nothing in the ALJ's decision explains why Sherman's brief 2019 employment as a paralegal/law clerk through a temporary agency might constitute "progress

towards independence" when compared to his 2018 work. In the absence of further elaboration from the ALJ on this point, substantial evidence does not support the ALJ's conclusion that Dr. Rexroad's finding of "no other progress towards independence" while Sherman worked part-time was inconsistent with his later part-time work, let alone inconsistent with his opinions on Sherman's limitations.

### ii.   Inconsistency with the TEASC Report

The ALJ also determined that Dr. Rexroad's 2018 opinions were inconsistent with the TEASC report, finding that Dr. Rexroad "continued to primarily base his opinion upon Asperger's Syndrome/ASD despite this impairment being ruled out" by that team. (*Id.* at 972). However, even if this were true,[8] the ALJ has not adequately explained how Dr. Rexroad's assessment is inconsistent with the TEASC opinion in light of his own findings concerning Sherman's medically determinable impairments. The ALJ found at step two of the sequential evaluation process that Sherman suffers from a severe medically determinable impairment of "Autism Spectrum Disorder *traits*." (*Id.* at 955) (emphasis added). As the ALJ explained:

---

[8] There are significant reasons to conclude that Dr. Rexroad did not premise his 2018 opinions on any formal diagnosis of ASD. To be sure, Dr. Rexroad included a "possible" ASD diagnosis in his treatment notes from September 2012 through November 2016 (*see* AR at 910-25), and in an August 22, 2018 letter, he expressed his "strong[] belie[f]" that Sherman suffers from ASD despite the 2016 TEASC findings (*see id.* at 1299). Yet in the intervening months—a period which included the formulation of his January 2018 medical source statement—Dr. Rexroad's treatment notes reflect that he had expressly *abandoned* a diagnosis of ASD upon receipt of the TEASC report. (*See id.* at 910) (November 2016 notes including ASD diagnosis but stating that TEASC "results [were] pending"); (*id.* at 909) (February 2017 notes stating condition was "ruled out by neuro"); (*id.* at 945-48, 1276-78) (showing no mention of ASD diagnosis in treatment notes from February 2017 through August 17, 2018); *cf. Sherman II*, 2019 WL 2450919, at *8-9 (citing, *e.g.*, AR at 555) (noting that Dr. Rexroad "remov[ed] Asperger's syndrome from Mr. Sherman's diagnoses based on [the TEASC] report"). This alternating approach to Sherman's formal diagnosis is further illustrated in Dr. Rexroad's August 2019 deposition testimony, in which he expressed a degree of uncertainty over the years as to whether ASD might be affecting Sherman's condition, notwithstanding his inclusion of that "possible" diagnosis in earlier treatment notes. (*See* AR at 1263) (diagnosing bipolar disorder and anxiety, but also stating that "I've really wondered throughout the course of treatment" whether ASD was "what's driven his psychopathology"). Thus, even though Dr. Rexroad eventually reincorporated an assessment of "unofficial" ASD into his treatment notes (*see* AR at 1274-75, 1299) (2019 notes), it is not clear that this record supports the inference that he was operating on this understanding when he provided his 2018 medical source statement. On remand, if the ALJ continues to find a material inconsistency between the TEASC report and Dr. Rexroad's 2018 opinion on this basis, he should elaborate further on how the record supports this conclusion.

One of the central inquiries of this case is whether the claimant has an autism spectrum disorder (ASD) or personality disorder. Importantly, neuropsychological and psychiatric professionals have characterized the claimant's mental impairments in various ways. *However, in determining whether an individual is disabled, what the impairment is called is of no real consequence.* Rather, how a given impairment affects mental functioning is the central inquiry under the Social Security Act. By finding that the claimant has "severe" mental impairments, however characterized, all symptoms affecting her [*sic*] mental functioning have been considered. *It is the impact of the impairment, and in particular, any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry rather than the name of the impairment.* Ultimately, the undersigned finds the claimant [suffers from] schizotypal and ASD "traits" but not the disorders themselves . . . .

(*Id.*) (emphasis added). Although the ALJ did not expressly identify the relevant "traits" that he associated with ASD, he apparently relied primarily on the TEASC report in reaching the conclusion that Sherman suffered from those traits.[9] (*See id.* at 955-56). And importantly, the ALJ's reasoning—that what matters is the nature and extent of the limitations that a claimant's traits impose, and that the official name of his condition is immaterial—is consistent with controlling caselaw. *See, e.g.*, *Madrid v. Astrue*, 243 F. App'x 387, 392 (10th Cir. 2007) (unpublished) (citing *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988)) ("[A] diagnosis of a condition does not establish disability. The question is whether a person's impairment significantly limits his ability to engage in substantial gainful activity.").

But if the ALJ is right that Sherman suffers from ASD "traits" and that the official diagnosis of his condition is "of no real consequence," then he must explain why the official diagnosis *is* of "real consequence" for purposes of determining that Dr. Rexroad's 2018 opinions

---

[9] Although Dr. Hughson's 2019 report is the only medical source statement to clearly break down Sherman's functional deficits "in terms of 'traits'" (*see* AR at 1239), the ALJ rejected that report (*see id.* at 969-70) while giving "some" weight to the TEASC findings (*see id.* at 965). Further, several of the traits "[f]rom the autism spectrum" identified by Dr. Hughson in her rejected report (*see id.* at 1239) (finding, *e.g.*, "rigid thinking patterns" and "hypo reactivity to sensory input") contradict the findings of the TEASC report (*see id.* at 933) (finding, *e.g.*, no "rigidity[] or sensory interests or aversions") that the ALJ appeared to adopt in relevant part (*see id.* at 963, 965). The unavoidable conclusion, therefore, is that it is the TEASC report from which the ALJ pulled the assessed ASD "traits." (*See id.* at 955-56) (criticizing Dr. Hughson's 2019 report, and favorably citing TEASC report, when discussing finding of schizotypal and ASD "traits").

and the TEASC report are materially inconsistent, when the sources' assessments of Sherman's limitations appear to be anything but. In concluding that Sherman does not suffer from ASD, the TEASC team identified certain findings that conflicted with a diagnosis of that condition, specifically that Sherman has social interests, some social functioning abilities, no difficulties with social reciprocity, and a lack of "clear restricted interests, repetitive behaviors, rigidity, or sensory interests or aversions." (AR at 933). Conversely, the traits that the TEASC team affirmatively identified as being possessed by Sherman—presumably the "ASD traits" identified and adopted by the ALJ—included an "intense fear [of] being scrutinized by others, worries about being negatively evaluated, lack of confidence in his social conversation skills, [and] avoidance of social situations" and interactions. (*See id.*). On their face, these findings are consistent with Dr. Rexroad's assessment of Sherman's social limitations, namely that he has only slight limitations in interacting with the public or asking simple questions, but also moderate limitations in getting along with others or maintaining socially appropriate behavior and marked limitations in accepting criticism from supervisors. (*See id.* at 941).

In other words, when considering the nature and extent of Sherman's limitations—the critical issue under scrutiny—the record does not appear to establish any inconsistency between Dr. Rexroad's 2018 assessment and the TEASC report's findings. The only apparent inconsistency between these two evaluations is the question of whether Sherman's condition should be labeled as ASD—and as the ALJ has correctly observed, that question is ultimately "of no real consequence." (*Id.* at 955); *see Madrid*, 243 F. App'x at 392 (citation omitted). In this light, the ALJ's conclusion that Dr. Rexroad's 2018 opinions may be rejected because he and the TEASC team disagree on the formal name of Sherman's condition, even though both factfinders

appeared to agree on the "traits" Sherman experiences and their impact on his limitations, is not supported by substantial evidence without further discussion.

    *iii.*   *Inconsistency with Dr. Rexroad's Earlier Medical Source Statements*

Beyond these matters, the ALJ focused much of his attention on purportedly unexplained inconsistencies between Dr. Rexroad's 2013 and 2014 medical source statements and his 2018 opinions. (*See* AR at 967). Specifically, the ALJ opined that Dr. Rexroad's 2018 statement was inconsistent with his earlier assessments of Sherman's limitations as to several abilities, and he appeared to conclude that this inconsistency could not be explained by the medical record since "Dr. Rexroad's treatment of the claimant between 2014 and 2018 remained the same (i.e., largely the same medication regimen with quarterly management appointments)." (*Id.*). Sherman takes issue with the ALJ's reliance on rejected medical opinions to find these purported inconsistencies (*see* Doc. 21 at 13-14), while the Commissioner contends that the alleged absence of any explanation for such deviations amounts to substantial evidence supporting the ALJ's findings (*see* Doc. 25 at 13).

As an initial matter, given that the ALJ accorded "little weight" to Dr. Rexroad's 2013 and 2014 opinions, it is questionable that any inconsistency with these opinions may amount to substantial evidence supporting an assignment of less than controlling weight to the 2018 statement. (*See* AR at 966-67); *cf. Flores v. Berryhill*, No. 1:17-cv-00603 KRS, 2018 WL 3546191, at *4 (D.N.M. July 24, 2018) (citing ALJ's "[i]nexplicabl[e]" decision to rely on medical evidence to establish impairment but to then reject the same evidence when evaluating RFC). After all, the Court cannot conclude that the ALJ found that Dr. Rexroad's 2013 and 2014 opinions "outweigh[ed]" his 2018 opinions if the ALJ rejected all three reports. *See Hamlin*, 365 F.3d at 1215. But even if this were not an issue, the Court finds that the ALJ's evaluation of the

alleged longitudinal variations in Dr. Rexroad's assessment of limitations improperly relied on

inaccurate characterizations of the record, speculative inferences, and an improper picking and

choosing among the medical evidence. Consequently, the ALJ's determination failed to adhere to

controlling standards and was unsupported by substantial evidence.

First, the ALJ's characterization of Dr. Rexroad's treatment of Sherman as merely a

matter of "medication management" (*see* AR at 967); (*see also, e.g.*, *id.* at 958, 962) does not

find clear supported in the record. Sherman was referred to Dr. Rexroad for psychiatric services,

not simply for medication management. (*See, e.g.*, *id.* at 840); (*see also id.* at 931) (noting

recommendation for continued "psychiatric care with Dr. Rexroad"). While Dr. Rexroad's

treatment regimen certainly included the prescribing and management of medications, his

records reflect that he provided Sherman a wider array of psychiatric services, including direct

therapy, referrals for specialist evaluations, recommendations for testing, guidance on substance

abuse, referrals for cognitive behavioral therapy and counseling, and patient education on

symptom management. (*See, e.g.*, *id.* at 909) (counselor and "CBT" referrals); (*id.* at 911-12)

(references to neuropsychiatric assessment, sleep evaluation, and AA attendance); (*id.* at 919)

(reading recommendation concerning sleep issues); (*see also id.* at 1014) (encouragement to seek

employment). Further, the ALJ cited nothing in the record showing that Sherman's other treating

providers, examining sources, or other sources characterized Dr. Rexroad's treatment as solely

limited to medication management. (*Cf., e.g.*, *id.* at 931) (TEASC report describing Sherman's

treatment under Dr. Rexroad); (*id.* at 777) (father's third-party report concerning Sherman's

treatment and evaluations). On this record, the conclusion that Dr. Rexroad simply managed

Sherman's medications appears to be premised on speculative inferences concerning the

quarterly nature of Sherman's appointments (*see, e.g.*, *id.* at 958) (finding "conservative[]

treat[ment] primarily through quarterly medication management appointments") and a selective

reading of Dr. Rexroad's treatment notes. Without additional support, such a conclusion was

error. *See, e.g.*, *Langley*, 373 F.3d at 1121 (disallowing the rejection of treating source opinions

premised on "speculative inferences").

Second, the ALJ overstated the variations between the opinions expressed by Dr.

Rexroad in 2018 and those expressed in his earlier medical source statements. In finding

"significant deviations" among Dr. Rexroad's statements over time, the ALJ cited four work-

related abilities in which Dr. Rexroad allegedly found lesser limitations in 2018 than he had in

2013 or 2014.[10] (*See* AR at 967). What the ALJ left unaddressed, however, is the fact that Dr.

Rexroad's assessment of Sherman's limitations remained consistent as to *twelve* out of the

twenty evaluated abilities when comparing his 2013 and 2018 statements, *compare* (*id.* at 468-

69), *with* (*id.* at 940-41), and remained consistent as to *fourteen* out of twenty evaluated abilities

when comparing his 2014 and 2018 statements, *compare* (*id.* at 477-78), *with* (*id.* at 940-41).

Moreover, *every* finding of marked limitations by Dr. Rexroad in 2018—and four of the six

findings of moderate limitations at that time—were previously assessed in one or both of his

earlier medical source statements. (*See id.* at 468-69, 477-78, 940-41). While the ALJ may have

nonetheless found that the "deviations" outweighed these consistent findings, his failure to

address the latter and explain why this was the case amounted to an impermissible picking and

choosing of evidence, "using portions of evidence favorable to his position while ignoring other

---

[10] In fact, Dr. Rexroad found *greater* limitations in 2014 and 2018 as to one of these four abilities cited by the ALJ, remembering locations and work-like procedures, than he did in 2013. (*See* AR at 468, 477, 940). And while Dr. Rexroad did find that Sherman had a "marked" limitation in getting along with coworkers or peers appropriately in 2013 (*see id.* at 469), the ALJ elided the fact that Dr. Rexroad's assessment of a "moderate" limitation in that ability in 2018 was also consistent with his 2014 findings to that effect (*see id.* at 478, 941).

evidence." *See Carpenter*, 537 F.3d at 1265; *see also Clifton*, 79 F.3d at 1010 (requiring ALJ to address "significantly probative" evidence that may support contrary findings).

Third, even if the ALJ's characterization of the differences among Dr. Rexroad's reports were accurate, his suggestion that Dr. Rexroad's assessment of limitations did not evolve in tandem with his treatment of Sherman's condition is flatly contradicted by the record. Although the ALJ asserts that "Dr. Rexroad's treatment of [Sherman] between 2014 and 2018 remained the same" (AR at 967), that period was in fact characterized by frequent alterations to Sherman's treatment regimen, including the assignment of multiple readings targeted to his symptoms, the adding and discontinuing of medications, repeated adjustments to medication dosages, referral for a sleep evaluation, referral to a psychotherapist for cognitive behavioral therapy, referral for a neuropsychiatric evaluation to rule out ASD, and referral to a new counselor. (*See, e.g.*, *id.* at 909-20, 945-48, 1276-78). Similar adjustments in Dr. Rexroad's treatment of Sherman also occurred prior to 2014 (*see, e.g.*, *id.* at 921-22), which is relevant to the extent that the ALJ highlights differences in Dr. Rexroad's evaluation of Sherman's limitations in 2013 when compared to later years (*see id.* at 967). The ALJ's characterization of Sherman's treatment regimen as "remain[ing] the same" while Dr. Rexroad's assessment of limitations allegedly fluctuated over time fails to address these facially significant adjustments. *See Bryant*, 753 F. App'x at 641 (ALJ may not mischaracterize evidence).

Fourth, and perhaps most significantly, the ALJ's finding that Dr. Rexroad "did not provide any reasons for why his [2018] opinion deviated from his opinions in 2013 and 2014" (AR at 967) ignored deposition testimony with direct relevance to this issue. At his August 2019 deposition, Dr. Rexroad concurred with an opinion expressed by Dr. Hughson, namely that "the persistence of a pattern or constellation of symptoms and dysfunction over time is precisely what

constitutes a chronic mental illness, despite ups and downs in severity and possibly different o[r] seemingly inconsistent reports throughout its course." (*See id.* at 1269) (deposition testimony); (*id.* at 1238) (Dr. Hughson analysis). Although the ALJ accorded little weight to Dr. Rexroad's deposition testimony as a whole, he did not address this particular medical opinion, and his reason for rejecting that testimony—that Dr. Rexroad's opinions on Sherman's ability to function were inconsistent with "generally normal mental status findings" and that Sherman regularly attended AA meetings (*see id.* at 965)—does not appear to have relevance to Dr. Rexroad's statements concerning the characteristics of chronic mental illness. The ALJ's failure to discuss Dr. Rexroad's professional opinion concerning the "ups and downs" that he found to be characteristic of chronic mental illness amounted to a failure to address evidence that was "significantly probative" to the alleged variations in Dr. Rexroad's assessment of limitations. *See Clifton*, 79 F.3d at 1010. Indeed, the ALJ's decision to ignore that explanation, and to instead apparently conclude that any such variations were unsupported by the record due to unchanged treatment, constituted an improper substitution of the ALJ's "lay opinion for that of a medical professional." *See Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007).

In summary, the ALJ's rejection of Dr. Rexroad's 2018 medical source statement as inconsistent with his earlier statements turned on an inaccurate characterization of his medical opinions, an improper characterization of his treatment of—and the nature of his treatment relationship with—Sherman, an apparent speculative inference drawn from Dr. Rexroad's treatment regimen, and a failure to address probative evidence that may support a contrary conclusion. These alleged shortcomings do not allow a finding of substantial evidence that Dr. Rexroad's 2018 medical source statement was inconsistent with his earlier opinions. Without

more, the decision to deny controlling weight to Dr. Rexroad's opinions due to this alleged

inconsistency was error.

<em>iv.    Summary</em>

An ALJ may accord less than controlling weight to a treating physician's medical

opinions only on the basis of contradictory medical evidence that outweighs those opinions, not

on the basis of "credibility judgments, speculation or lay opinion." *See, e.g.*, *Langley*, 373 F.3d at

1121 (quotation omitted); *see also Hamlin*, 365 F.3d at 1215. In doing so, the ALJ must take care

to discuss significantly probative evidence that does not support his findings, without

mischaracterizing the record or improperly picking and choosing among the medical evidence.

*See Bryant*, 753 F. App'x at 641 (citation omitted); *Carpenter*, 537 F.3d at 1265 (citation

omitted); *Clifton*, 79 F.3d at 1009-10.

Here, substantial evidence does not support the ALJ's conclusion that the assessment of

limitations found in Dr. Rexroad's 2018 medical source statement was inconsistent with the

medical evidence of record. Because this is the case, and because substantial evidence does not

support the ALJ's conclusion that Dr. Rexroad's 2018 opinions lacked objective medical

support, the decision to deny controlling weight to those opinions was error, and remand is

required. *See Watkins*, 350 F.3d at 1300; *see also* 20 C.F.R. § 404.1527(c)(2).

**C.  Other Factors**

Because the ALJ's decision to accord less than controlling weight to Dr. Rexroad's 2018

opinions was unsupported by substantial evidence and did not comply with governing legal

standards, it is not necessary to proceed to the second step of the *Watkins* analysis, *i.e.*,

consideration of the appropriate non-controlling weight to assign to his opinions, at this time. *See*

27

*Watkins*, 350 F.3d at 1300-01 (noting that the treating-source analysis is "sequential"). Such considerations, if they are to be made at all, should be provided by the ALJ in the first instance.

Nevertheless, the Court is aware that both Sherman and the Commissioner have a strong interest in the timely resolution of this matter. Sherman's application for benefits has been the subject of almost *nine years* of adjudications, including rejections at the initial and reconsideration levels (*see* AR at 66-67, 92-93), three ALJ decisions (*id.* at 16-26, 538-58, 952-75), several Appeals Court assessments (*id.* at 1-3, 639, 1068), and now three judicial opinions directing remand (*see id.* at 622-36, 1033-65). The fulcrum issue common to each of the judicial actions thus far has been the ALJ's weighting of Dr. Rexroad's medical opinions, *see Sherman I*, 2017 WL 3575868, at *3-5; *Sherman II*, 2019 WL 2450919, at *7-13, including the sufficiency of the ALJ's assessment of Dr. Rexroad's 2018 opinions under the second step of the *Watkins* analysis, *see Sherman II*, 2019 WL 2450919, at *11; (*see also, e.g.*, Doc. 26 at 5-6) (discussing specialization and treatment frequency). Thus, to aid in the expedient resolution of this matter in the event that the ALJ continues to conclude that Dr. Rexroad's opinions are not entitled to controlling weight—and does so in accordance with the governing legal standards and pursuant to substantial evidence—the Court addresses the following issues that are relevant to the factors considered under the second *Watkins* step. *See Watkins*, 350 F.3d at 1301 (quoting *Drapeau*, 255 F.3d at 1213) (citing factors).

### i.   *Length of Treatment History and Frequency of Examination*

An ALJ must consider "the length of the treatment relationship and the frequency of examination" when determining what weight to accord a medical opinion that is not entitled to controlling status. *See id.* (quoting *Drapeau*, 255 F.3d at 1213). The chief concern of this inquiry

is whether "the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [his] impairment." 20 C.F.R. § 404.1527(c)(2)(i).

Here, the ALJ properly acknowledged Sherman's "eight years of treatment" under Dr. Rexroad. (*See* AR at 973). However, the ALJ's repeated observations that Sherman only presented to Dr. Rexroad on a quarterly basis failed to address the record evidence showing that the infrequency of visits may have been due to "financial considerations . . . because Dr. Rexroad doesn't accept insurance." (*See* Doc. 26 at 6) (citing AR at 1262). On remand, before concluding that the infrequency of Sherman's appointments with Dr. Rexroad amounts to a "conservative" treatment plan or otherwise requires an assignment of lower weight to his medical opinions (*see* AR at 958), the ALJ will consider whether Sherman's financial circumstances may support a contrary determination. *See Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004) ("[T]he ALJ may not discredit [a claimant] for lack of treatment or aggressive testing when . . . she has a legitimate reason for [failing] to get additional treatment, such as lack of funds."); *see also Clifton*, 79 F.3d at 1010 (requiring discussion of "significantly probative" evidence weighing against ALJ findings); SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016) (allowing consideration for the fact that "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services").

*ii.   Nature and Extent of the Treatment Relationship*

An ALJ must consider "the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed." *Watkins*, 350 F.3d at 1301 (quoting *Drapeau*, 255 F.3d at 1213); *see also* 20 C.F.R. § 404.1527(c)(2)(ii). As previously discussed, the ALJ has not provided substantial evidence in support of the conclusion that Dr. Rexroad's treatment of Sherman is accurately summarized as a "medication management"

relationship. (*See, e.g.*, AR at 967). On remand, if the ALJ continues to view the treatment relationship as primarily one of medication management, he will explain why this characterization is supported by the record.

### iii.   Consistency Between the Medical Opinions and the Record

An ALJ is required to consider the "consistency between the opinion and the record as a whole." *Watkins*, 350 F.3d at 1301 (quoting *Drapeau*, 255 F.3d at 1213); *see also* 20 C.F.R. § 404.1527(c)(4). The Court has already cited shortcomings in the ALJ's conclusion that Dr. Rexroad's 2018 opinions are inconsistent with the medical evidence. Moreover, further explanation is required in order for substantial evidence to support the ALJ's findings regarding the purported inconsistencies between Dr. Rexroad's opinions and the non-medical record.

The ALJ determined that Sherman's holding of part-time work in 2019 was inconsistent with Dr. Rexroad's 2018 assessment of limitations. (*See* AR at 972-73). However, the ALJ's reasoning on this point is internally inconsistent; he acknowledges that Sherman was terminated from his position within "several months" for "making the employing attorney feel uncomfortable," yet oddly concludes that the record contains "no indication that he was not getting along with coworkers or inappropriately responding to instructions or criticisms from his supervisor." (*See id.*); (*cf., e.g., id.* at 994) (testifying that "I was told . . . specifically that I made the boss nervous"). Further, although the ALJ found that Sherman "was able to maintain punctuality and a regular schedule for several months while working in this capacity" (*id.* at 972-73), this conclusion appears to be speculative; the record includes no discussion of Sherman's punctuality or adherence to work hours at that job. *See, e.g., Silva v. Saul*, No. 20-cv-00305 JFR, 2021 WL 1391061, at *9 (D.N.M. Apr. 13, 2021) (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993)) (observing that "the absence of evidence is not evidence" sufficient to

reject treating source opinion). The record also includes uncontradicted testimony that Sherman

has lost "a number of jobs" because of "conflict[s] with people or related to interpersonal

interaction" (*see* AR at 960) and has sometimes struggled to maintain punctuality and a regular

schedule (*see, e.g.*, *id.* at 576) (hearing testimony), factors that appear to support Dr. Rexroad's

assessment of marked limitations as to these abilities (*see id.* at 940-41). On remand, the ALJ

will provide an appropriate explanation for any continued conclusion that Sherman's 2019 part-

time work undermines Dr. Rexroad's assessment of limitations.

In rejecting the findings of significant limitations by Sherman's providers, the ALJ also

asserted that the record "is littered with copious reports that the claimant completes his activities

of daily living without assistance." In particular, the ALJ pointed out that Sherman

> has reported using the computer at the library to search for work, attending AA
> meetings, playing games with friends, attending service twice per week at the
> synagogue, going to the movies, using public transportation, and shopping in stores.
> Between 2010 and April 2012 . . ., [Sherman] also reported continued work as a
> substitute teacher, spending time with his "few" friends at their homes or the
> movies, regularly attending AA meetings, living alone, and having "good"
> activities of daily living.

(*Id.* at 972). While these findings are supported by the record, Judge Khalsa has ruled that

several of these activities "do not in themselves preclude the work-related limitations Dr.

Rexroad attributed to Mr. Sherman." *See Sherman II*, 2019 WL 2450919, at *11. Similarly, the

ALJ has not "explain[ed] what, if anything, about Mr. Sherman's participation in these activities

was inconsistent with the work-related limitations to which Dr. Rexroad opined." *See id.* And

regarding Sherman's statement in 2012 that his activities of daily living were "good" (*see* AR at

415), "the ALJ did not acknowledge or account for the record evidence that Mr. Sherman's

engagement in daily activities varied significantly from day to day and was frequently severely

limited by his mental impairments." *See Sherman II*, 2019 WL 2450919, at *11 n.32 (citing AR

at 45). As these quotations from *Sherman II* illustrate, the ALJ has been on notice that further

explanation is required as to why Sherman's activities of daily living are inconsistent with Dr. Rexroad's assessment of his limitations. Yet the ALJ did not address this point, instead making the related but distinct argument that Sherman's activities of daily living were consistent with his RFC findings. (*See* AR at 972). To the extent that the ALJ continues to find inconsistencies in these matters, he shall explain why this is the case.

### iv.   *Specialization*

In *Sherman II*, Judge Khalsa found error in ALJ Farris's failure to address "whether the treatment [Dr. Rexroad] provided was within his specialty." *See* 2019 WL 2450919, at *11; *see also, e.g.*, 20 C.F.R. § 404.1527(c)(5). There is, likewise, no discussion of specialization in the instant ALJ decision. That said, it is not clear that the record supports a need for further discussion of this issue. Though Sherman argues that "Dr. Rexroad's specialty is Psychiatry" (*see* Doc. 21 at 12 & n.13) (citing AR at 1260), the ALJ has of course acknowledged that Dr. Rexroad is Sherman's psychiatrist (*e.g.*, AR at 955), and Sherman's citations asserting a narrower field of specialty point outside of the administrative record (*see* Doc. 21 at 12 n.13) (citing websites). If the record supports a finding of additional relevant specialization, and if the ALJ nonetheless continues to accord less than controlling weight to Dr. Rexroad's opinions upon remand, the ALJ will make clear his consideration of this factor.

## V.  Conclusion

The ALJ erred in his review of Sherman's application for disability insurance benefits and supplemental security income by failing to properly weigh the treating psychiatrist's 2018 opinions pursuant to governing legal standards and failing to properly support his weighting with substantial evidence. Accordingly, Sherman's Motion to Reverse and Remand for a Rehearing (Doc. 21) is **GRANTED**, and the Court remands this case back to the SSA for proceedings consistent with this opinion.

_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**